**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD LYNCH, | ) | CASE NO. 1:19-CV-844 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Richard Lynch ("Plaintiff" or "Lynch"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"),under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties,

pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final

decision is VACATED and REMANDED for further consideration consistent with this opinion.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

# I. PROCEDURAL HISTORY

On June 30, 2015, Lynch filed an application for POD and DIB, alleging a disability onset date of January 6, 2015, and claiming he was disabled due to depression, hypothyroidism, migraine headaches, and severe back pain. (Transcript ("Tr.") at 94, 175.) The applications were denied initially and upon reconsideration, and Lynch requested a hearing before an administrative law judge ("ALJ"). (Tr. 115-16.)

On December 20, 2017, an ALJ held a hearing, during which Lynch, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 36-65.) On May 10, 2018, the ALJ issued a written decision finding Lynch was not disabled. (*Id.* at 15-26.) The ALJ's decision became final on February 21, 2019, when the Appeals Council declined further review. (*Id.* at 1-6.)

On April 16, 2019, Lynch filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 13, 14.) Lynch asserts the following assignments of error:

> (1) The ALJ failed to properly evaluate the evidence and give controlling weight to the opinions of treating sources in violation of 20 C.F.R. § 404.1527.
>
> (2) The ALJ's determination regarding credibility was not supported by substantial evidence and violated Social Security Ruling 16-3p.
>
> (3) The ALJ did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 12 at 1.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Lynch was born in December 1964 and was a "person closely approaching advanced age" under social security regulations at all times relevant to this case. (Tr. 24.) *See* 20 C.F.R. §§

404.1563 & 416.963.  He has at least a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a packager and material handler.  (*Id.*)

**B.     Relevant Medical Evidence[2]**

**1.     Mental Impairments**

On October 28, 2014, Lynch was evaluated at Appleseed Community Mental Health Clinic ("Appleseed").  (Tr. 395.)  He was diagnosed with dysthymic disorder and generalized anxiety disorder.  (*Id.* at 396.)  At that time, Lynch declined counseling.  (*Id.*)

On February 18, 2015, primary care physician Dr. Vernon Vore saw Lynch for an annual checkup.  (*Id.* at 605.)  He noted that Lynch was "cooperative" with an "appropriate mood & affect" and normal judgment, but he "still has a very negative outlook towards most everyone in his life."  (*Id.* at 607.)

On January 26, 2016, Dr. Vore counseled Lynch for half an hour regarding his depression.  (*Id.* at 855.)  Lynch had stopped taking Paxil, and Dr. Vore re-started that prescription and recommended counseling at Appleseed.  (*Id.*)

On December 19, 2016, Dr. Vore examined Lynch and noted that Lynch was dating someone and seemed a lot happier.  (*Id.* at 823.)

On May 22, 2017, Dr. Vore examined Lynch and noted that Lynch "does not seem to have any good relationships." (*Id.* at 817.)  At this point, his "active problems" included anxiety, chronic depression and OCD.  (*Id.* at 818.)

By July 19, 2017, Lynch had begun therapy at Appleseed.  (*Id.* at 921.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On August 21, 2017, Dr. Vore noted that Lynch reported night terrors and was concerned about his memory. (*Id.* at 912.)

On October 3, 2017, Lynch returned to Appleseed for a follow-up appointment. (*Id.* at 921.) Treatment notes show he had been diagnosed with Persistent Depressive Disorder. (*Id.* at 922.)

## 2. Physical Impairments

On July 9, 2013, Lynch began pain management with Dr. Barnett Crawford at Samaritan Regional Health Center. (*Id.* at 703.) He reported that, following a L4-L5 and L5-S1 fusion surgery in 1994, he had experienced persistent aching, throbbing, sharp low back pain. (*Id.*) This pain management relationship continued until Lynch's care was transferred to Dr. Zachary Zumbar at the same practice in January 2014. (*Id.* at 690.)

A February 2014 CT scan ordered by Dr. Zumbar showed post-surgical changes to the posterior rod and pedicle screw fusion of Lynch's L4 through S1 vertebrae, associated with a prior laminectomy. (*Id.* at 709.) It also showed a broad-based posterior disc bulge at L1-L2, and evidence of facet and ligamentum hypertrophy and a shallow posterior disc bulge at L3-L4. (*Id.*)

By April 2014, Dr. Zumbar had tried epidural injections to control Lynch's pain. (*Id.* at 684.) The initial injection was fully effective for approximately one week. (*Id.*) A second injection, in the summer of 2014, provided "a few months of solid relief." (*Id.* at 681.)

On February 11, 2015, Lynch underwent surgery for adjacent L3-L4 laminectomy and fusion. (*Id.* at 639.)

On February 18, 2015, Dr. Vore saw Lynch for an annual checkup. (*Id.* at 605.) He noted that Lynch had back surgery the previous week, and was "still having lots of back pain but the

radiating pain into pelvis and legs is much better." (*Id.*) Because Lynch was wearing a heavy belly/back brace, Dr. Vore did not do a musculoskelatal examination. (*Id.* at 607.)

From February 17, 2015 through March 19, 2015, Lynch completed nine of eleven scheduled physical therapy appointments to assist his recovery from back surgery. (*Id.* at 428.) He "met all goals"[3] and was 'progressing well." (*Id.*)

From March 24, 2015 through April 20, 2015, Lynch completed ten of eleven scheduled physical therapy appointments for "work conditioning," a program to help him resume heavy labor job duties. (*Id.* at 428.) He was "progressing well towards his goals," but had to discontinue therapy when his insurance would no longer cover it. (*Id.*)

On May 6, 2015, Lynch returned to Dr. Zumbar for pain management. (*Id.* at 675.) He reported that the surgery had eliminated his leg pain, but he had constant, worsened pain on the right side of his lower back. (*Id.*)

On June 26, 2015, Lynch returned to Dr. Zumbar, who noted that Lynch was not able to pursue either sacroiliac joint injections or the Chronic Pain Management program at the Cleveland Clinic due to financial constraints. (*Id.* at 672.) Dr. Zumbar also noted that Lynch's anxiety and depression, while "certainly not the primary cause for his symptoms" are "a contributing factor." (*Id.*)

On September 25, 2015, Lynch began treatment with Dr. Douglas Ehrler at Crystal Clinic Orthopaedic Center. (*Id.* at 618.) He sought relief for continuous lower back pain that radiated to both his hips, the right side of his buttocks, and his right leg. (*Id.*) On examination, his lumbar

---

[3] His goals included increasing his lumbar range of motion so that he could don and doff shoes, managing his hip pain so that he could squat to retrieve objects from the floor, and managing his overall pain so that he could sleep through the night. (Tr. 555.)

range of motion was limited, stiff and painful, his lumbar sensation was deficient, and his lumbar reflexes were decreased or negative. (*Id.* at 620-21.) He was diagnosed with degenerative spondylolisthesis at L3-L4. (*Id.* at 621.)

On October 6, 2015, Lynch had an MRI of his lumbar spine, which showed large "susceptibility artifacts" (implanted metallic hardware) from his previous spinal surgeries that made it impossible to read the MRI from L4 to S1. (*Id.* at 570-571.) The MRI did show degeneration and mild disc bulging at the L3-L4 level, and minimal disc bulging with encroachment at L2-L3. (*Id*.)

On November 20, 2015, Lynch returned to see Dr. Ehrler at Crystal Clinic to discuss the results of his MRI. (*Id.* at 632.) Dr. Ehrler diagnosed spinal stenosis of the lumbar region with radiculopathy, foraminal stenosis of the lumbar region, and spondyloisthesis at the L3-L4 level. (*Id.*) After discussing both non-operative and operative therapies, Lynch decided to proceed with surgery to relieve the symptoms in his legs that resulted from a pinched nerve. (*Id.* at 634.)

On December 15, 2015, Dr. Ehrler performed surgery to revise the laminectomy at Lynch's L3 vertebrae, remove hardware from his previous surgeries, insert new hardware, and fuse Lynch's L3-L4 vertebrae. (*Id.* at 639.) He noted that the old hardware was encased in bone, which was cut to remove the hardware. (*Id.*)

At a January 1, 2016 post-operative visit, Dr. Ehrler noted that Lynch reported his leg pain was gone, and he was "doing well." (*Id.* at 642.)

On February 15, 2016, Lynch re-established pain management with Dr. Zumbar. (*Id.* at 667.) He described his pain post-surgery as "persistent, if not worse." (*Id.*) Dr. Zumbar noted his symptoms were consistent with "lumbosacral spondylosis along with postlaminectomy syndrome," and prescribed a longer-acting medication, Kardian, although he was not hopeful that either

medication or surgery could relieve Lynch's pain.  (*Id.* at 668.)  He strongly advised chronic pain rehabilitation, which would be helpful "with both his physical and mental status," but Lynch declined "due to the financial commitment."  (*Id.*)

An MRI on June 15, 2016, showed post-surgical changes in Lynch's L3 through S1 vertebrae, without central spinal canal or foraminal stenosis.  (*Id.* at 766.)

On September 2, 2016, Dr. Zumbar performed a sacroiliac join injection to treat Lynch's pain.  (*Id.* at 775.)

On September 15, 2016, Lynch had an MRI of his brain.  (*Id.* at 777-78.)  It was normal except for a partially empty sella, and mucus retention in Lynch's right sinus.  (*Id.*)

On September 20, 2016, Lynch returned to Dr. Zumbar for a follow-up visit, and reported that the benefit from the joint injection had been "minimal."  (*Id.* at 779.)

Lynch's chiropractor, Dr. Paul Agee, provided an undated Medical Assessment of Ability to Do Work Related Activities (Physical).  (*Id.* at 736-740.)  He stated that he'd been treating Lynch for two years, and opined that Lynch had the following limitations:

- stand/walk for a total of 1-2 hours in an eight-hour workday;

- stand/walk for 1 hour without interruption;

- sitting for "long periods" would cause discomfort;

- carry 10 pounds occasionally;

- never climb, or push/pull;

- occasionally balance, stoop, crouch, kneel, crawl, reach, handle, and finger;

-  frequently see, hear, and speak; and

7

- as a result of his pain and lumbar issue, have marked limitations in carrying out complex or detailed job instructions.

(*Id.*)

On May 22, 2017, Dr. Vore examined Lynch and noted that Lynch could "bend over and reach almost to ankles" and pick up a twenty-five-pound chair, although not repetitively. (*Id.* at 819.) He also filled out a Physical Capabilities Questionnaire. (Id. at 373-74.) He opined that Lynch had the following limitations:

- not at all squat at the knees or climb ladders;

- occasionally bend at waist, kneel, crawl, or "light pull";

- frequently sit, stand, and walk, as long as these were alternated in "20-30 intervals" throughout the day;

- frequently "light push";

- drive or use foot controls for no longer than two hours; and

- lift 20 pounds occasionally and 10 pounds frequently.

(*Id.*)

On August 7, 2017, Lynch was seen by Dr. David Stainbrook to review abnormal bloodwork results. (*Id.* at 1163.) He exhibited only three of eighteen tender points for fibromyalgia, but had right lower extremity parasthesias. (*Id.* at 1165.) He also had positive antinuclear antibodies, an abnormal immunological finding, and a positive rheumatoid factor. (*Id.* at 1166.)

On September 15, 2017, Lynch was treated by chiropracter Wayne Schmidt for cervical pain and thoracic pain. (*Id.* at 1207.) At a follow-up appointment on September 18, 2017, Lynch reportedly told Dr. Schmidt that he was feeling better, the adjustment had been helpful, and that

while his low back was a "constant problem," he no longer had pain between his neck and shoulders and his breathing had improved. (*Id.* at 1208.)

On September 26, 2017, Lynch returned to Dr. Zumbar, who noted that "the majority of his symptoms seem to be mechanical," and tried a stronger anti-inflammatory medication, Daypro. (*Id.* at 1188.) At a follow up appointment on November 20, 2017, Lynch reported the Daypro was "at least mildly helpful" for his back. (*Id.* at 1195.)

**C.    State Agency Reports**

    **1.    Mental Impairments**

On November 15, 2015, state agency reviewing psychologist Katherine Fernandez opined that Lynch had affective and anxiety-related disorders that moderately restricted his activities of daily living and ability to maintain concentration, persistence, or pace; and mildly restricted his ability to maintain social functioning. (*Id.* at 70.) Dr. Fernandez also opined that Lynch had the following limitations to his functional capacity:

- may have some limitations sustaining pace when distracted by surroundings, and therefore should work in a setting where pace can vary and there are no strict quotas; and

- should be in a setting with no more than occasional changes to routine and environment.

(*Id.* at 74-75.)

On January 25, 2016, state agency reviewing psychologist Paul Thangeman added the limitation that Lynch was "capable of being around others on a frequent and superficial basis" to those previously found by Dr. Fernandez. (*Id.* at 92.)

On March 23, 2017, state agency reviewing psychologist Sheri Tomak of the Dallas Disability Processing Unit, determined that the PRFT/MRFC completed January 25, 2016 remained applicable. (*Id.* at 741.)

## 2. Physical Impairments

On November 12, 2015, state agency reviewing physician Gary Hinsman opined that Lynch had degenerative and discogenic disorders of the back and migraine headaches that created the following limitations in Lynch's functional capacity:

- occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds;

- stand and/or walk and sit about 6 hours in an 8-hour workday;

- occasionally climb ladders, ropes, or scaffolds, and crawl;

- frequently climb ramps, or stairs, stoop, kneel, and crouch; and

- avoid even moderate exposure to hazards such as machinery and heights.

(*Id.* at 72-73.)

On February 24, 2016, state agency reviewing physician Theresa March opined that new medical records supported the finding of these additional limitations:

- never climb ropes, ladders, or scaffolds; and

- occasionally stoop, kneel, and crawl.

(*Id.* at 89-90.)

On March 29, 2017, state agency reviewing physician Dorothy Leong, of the Dallas Disability Processing Unit, concurred with the finding of residual functional capacity from February 24, 2016. (*Id.* at 744-45.)

10

**D.** **Hearing Testimony**

During the December 20, 2017 hearing, Lynch testified to the following:

- He lives in Ashland, Ohio, with his 79 year-old mother. (*Id.* at 39-40.)

- From February 2000 until February 2015, he was employed by Sectional Stamping, first as a laborer and then as a welding technician. (*Id.* at 40-41.)

- In that job, he did a lot of lifting, bending and twisting. He lifted loads up to 60 pounds, and was on his feet for most of the workday. (*Id.* at 42-44.)

- His last day of physical work was January 5, 2015. He had back surgery on February 11, 2015. After that, he was on short- term disability, and in July of 2015, he went on long-term disability. (*Id.* at 45.)

- He had to stop working because he was experiencing a "tremendous amount" of pain in his right hip and right groin, and his right leg was going numb. (*Id.* at 46.)

- He was having problems lifting, standing, and walking, as well as doing physical aspects of his job such as climbing into containers for materials. (*Id.* at 47.)

- Currently, he can lift four or five pounds and stand or walk for ten minutes before he needs to sit down. (*Id.*)

- He can drive, and runs short errands every day. He grocery shops, but has trouble interacting with people at the store because he is in so much pain that he just wants to get what he needs and get home. (*Id.* at 48.)

- When he worked, he sometimes had trouble getting along with supervisors or co-workers. (*Id.*)

- He sometimes clashes with his mother "because we're in close proximity every day." He sometimes helps her out with cooking, doing laundry, general cleaning, or dusting. (*Id.* at 49.)

- He is dating someone he met at church. The relationship started a little over a year ago. (*Id.* at 50.)

- Other than church, he is not involved in activities outside the home. He is a member of the NRA, but doesn't attend meetings. (*Id.* at 50-51.)

- In 2015, he lost two friends that he "had known for many, many years." One was an older gentleman that he looked up to "as a father figure." He could not remember who the other was. (*Id.* at 51.)

- He has a wood-burning stove in his home. He can carry one or two pieces of firewood, weighing three to five pounds, at a time. The wood is stored about twelve feet from the house. (*Id.* at 52.)

- He mows his lawn with a push mower about once every week-and-a-half. He has a large lot, and spreads the mowing out over three days. (*Id.* at 52.)

- His thyroid issue makes him "constantly tired." He also suffers from depression, and needs hearing aids, and there are some sounds he can no longer hear at all. (*Id.* at 53.)

- He hasn't had a migraine since he stopped working, so he assumes they were stress-related. (*Id.*)

- He is 5 feet 10 inches tall, and weighs about 191 pounds. (*Id.* at 54.)

- He doesn't socialize much anymore because most of his friends were "older folks" and "most of them have passed away." (*Id.* at 55.)

- He used to attend car shows, drag races, and dirt track races with his son, but he no longer goes to any of those events because he cannot walk the necessary distance on concrete, and cannot sit on bleachers. This caused his son to get upset and created stress in their relationship. (*Id.*)

- His push-mower is self-propelled, and has an electric start. (*Id.* at 56.)

- He has had various adverse reactions to his medications. One pain medication gave him "symptoms of a heart attack." Another medication made him sleep for four days, and on the fourth day he "woke up alert and I went to the living room and I looked my mother right in the eye and I told her to kill me and that scared her quite a bit." Currently, about half of his medications make him drowsy. (*Id.* at 58.)

- He naps about three times a week. (*Id.* at 59.)

- He goes to the chiropractor "every week-and-a-half to two weeks" for a neck adjustment. His neck pain causes headaches. (*Id.*)

The VE testified Lynch had past work as a "composite job" combining packager and material handler.  (*Id.* at 60.)  The ALJ then posed the following hypothetical question:

> Assume a hypothetical individual the claimant's age and education with the past work that you described.  Assume that this individual was limited to light residual functional capacity.  The individual can stand and walk up to 6 hours in an 8-hour workday; can sit up to 6 hours in an 8-hour workday; can lift and carry twenty pounds occasionally, 10 pounds frequently.  This individual can frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds.  This individual can occasionally stoop, kneel, crouch and crawl.  There can be occasional exposure to workplace hazards.  There can be no strict production requirements and the work environment should be static with no more than occasional changes in routine.  At the light exertional level, can the individual perform the past work? . . . [I]s there other work that can be performed?

(*Id.* at 61.)

The VE testified the hypothetical individual would not be able to perform Lynch's past work as packager and material handler.  (*Id*.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as routing clerk, marking clerk, and inspector.  (*Id*.)

The ALJ then posed another hypothetical question:

> [A]ssume the same limitations as the first hypothetical at the light exertional level, but in addition, this individual would be absent from work two days per month.  With that additional limitation, is there still work that can be performed?

(*Id.* at 62.)

The VE testified that absenteeism above one day per month would preclude work.  (*Id.*)

The ALJ asked an additional hypothetical question:

> [A]ssume the same limitations as in the first hypothetical, but in additional this individual would be off-task greater than 10 percent of the time in an 8-hour workday.  With that additional off-task limitation, would there still be other work?

(*Id.* at 62-63.)

The VE testified that this off-task limitation would preclude employment. (*Id.* at 63.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(I)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Easy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.

*See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Lynch was insured on his alleged disability onset date, January 6, 2015, and remained insured through December 31, 2020, his date last insured ("DLI.") (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Lynch must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since January 6, 2015, the alleged onset date.

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; depressive disorder; and anxiety disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined

in 20 CFR 404.1567(b) such that the claimant is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand or walk for six hours in an eight-hour workday; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; occasional exposure to workplace hazards; no strict production requirements; and the work environment should be static with no more than occasional changes in routine.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on December **, 1964 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to a finding of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.  Considering the claimant's age, educations, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from January 6, 2015, through the date of this decision.

(Tr. 17-25.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Easy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572

F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence,

however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.      Opinions of Treating Sources and State Agency reviewers

Lynch first asserts that the ALJ erred in his evaluation of and assignment of weight to the opinions of treating physicians Dr. Vernon Vore and Dr. Don Moore,[4] and chiropractor Paul Agee. (Doc. No. 12 at 13.)  The ALJ gave the doctors' opinions "some weight" and the chiropractor's opinion "little weight."  (Tr. 22-23.)  Lynch asserts the ALJ misstated Dr. Vore's opinion because he relied on a treatment note in the medical records, and overlooked the contemporaneous Physical

---

[4] Lynch does not explain why he feels the ALJ erred in his treatment of Dr. Moore's opinion, and so that opinion will not be addressed here. *Kuhn v. Washtenaw Cnty,* 709 F.3d 612, 624 (6th Cir. 2013) ("arguments adverted to in only a perfunctory manner, are waived.")

Capabilities Questionnaire that Dr. Vore completed for the Reliance Standard Insurance Company. (Doc. No. 12 at 13.) Further, he asserts the ALJ erred by failing to weigh the opinions of state agency reviewers regarding Lynch's mental limitations. (Doc. No. 12 at 16.) Finally, he asserts the ALJ's determination that chiropractor Paul Agee was not an acceptable medical source that can render a medical opinion was an error, and Dr. Agee's opinion should have been given greater weight in determining the severity and functional effects of Lynch's impairments. (Doc. No. 12 at 17.)

The Commissioner responds that, although it is true that the ALJ did not review Dr. Vore's Physical Capabilities Questionnaire, this was harmless error, and he gave good reasons for assigning "little weight" to the opinion he did consider. (Doc. No. 13 at 5-6.) He states that the only discrepancy between Dr. Vore's Physical Capabilities Questionnaire and the ALJ's finding of residual functional capacity is the lack of a sit/stand option in the latter, and asserts that even if this opinion had been given "controlling weight," it would not have altered the outcome of the case. (*Id.* at 6.) He asserts that the ALJ's failure to weigh the state agency reviewers' opinions regarding mental limitations was also a harmless error, because he adopted the two of the limitations they proposed and "implicitly" rejected the third. (*Id.* at 8.) Finally, he asserts that the ALJ was correct in determining that Dr. Agee was not an acceptable medical source, and gave additional good reasons for rejecting his opinion. (*Id.* at 9.)

### 1. The Opinion of Dr. Vore

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of*

19

*Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5] However, "a finding that

a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case

record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should

be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p,

1996 WL 374188 at *4 (SSA July 2, 1996)).[6] Indeed, "[t]reating source medical opinions are still

entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527

and 416.927." *Blakley*, 581 F.3d at 408.[7] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner

does not give a treating-source opinion controlling weight, then the opinion is weighed based on the

length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's

area of specialty and the degree to which the opinion is consistent with the record as a whole and is

supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific

to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

---

[5] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017). In this case, Lynch filed his claims on June 30, 2015. (Tr. 94.)

[6] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.

"A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

In this case, the record shows that Dr. Vore had been Lynch's primary care physician since at least February 2015. (Tr. 605.) By May 22, 2017, when Dr. Vore's treatment notes state that he completed the Physical Capabilities Questionnaire and contain the notation that Lynch could "bend over and reach almost to ankles" and "pick up a chair - 25 pounds. noot [sic] repetitively," he had seen Lynch at least four times, and the Commissioner acknowledges Dr. Vore met the criteria for a "treating physician" under the Social Security regulations. (*Id.* at 819, 605, 814, 823, 855.)

The ALJ explains his evaluation of Dr. Vore's opinion as follows:

> The undersigned gives some weight to the opinion of Vernon Vore, M.D., that the claimant is able to lift 25 pounds. Dr. Vore is the claimant's treating physician, giving him a longitudinal perspective from which to assess the claimant's conditions. In addition, Dr. Vore's opinion is generally consistent with the medical evidence above. For example, despite some findings of lumbar tenderness, reduced range of motion, and diminished reflexes, physical examinations produced normal findings. However, Dr. Vore did not provide a specific function-by-function assessment of the claimant's abilities. Therefore, the undersigned afforded some weight.

(*Id.* at 23.) This is a legally-sufficient explanation for the ALJ's decision not to give controlling weight to the 25-pound limitation contained in Dr. Vore's treatment notes. Even if it wasn't, that error would be harmless, because he instead applied a more restrictive limitation in his finding of residual functional capacity: that Lynch could carry "20 pounds occasionally and 10 pounds frequently." (*Id.* at 21.)

However, the ALJ's capable handling of the opinion expressed in Dr. Vore's treatment notes does not excuse his failure to address, or even acknowledge, the more restrictive, and more complete, Physical Capabilities Questionnaire which Dr. Vore completed on the same date. As Lynch noted, that assessment did contain specific function-by-function assessments of his abilities, including that Lynch could:

- not at all squat at the knees or climb ladders;

- occasionally bend at waist, kneel, crawl, or "light pull";

- frequently sit, stand, and walk, as long as this was alternated in "20-30 intervals" throughout the day;

- frequently "light push";

- drive or use foot controls for no longer than two hours; and

- lift 20 pounds occasionally and 10 pounds frequently.

(*Id.* at 373-74.)

Contrary to the Commissioner's assertion, this opinion differed from the ALJ's finding of residual functional capacity in more ways that simply the addition of the option to alternate frequently between sitting and standing. It also added a complete restriction on squatting,[8] a restriction of "frequent" pushing and "occasional light" pulling, and a restriction on driving and using foot controls to no more than two hours. (*Id.*)

While the Commissioner may be correct that evaluating the more specific, function-by-function assessment Dr. Vore provided will not change the outcome of this case, the Social Security

---

[8] While the precise difference between a squat and a crouch is debatable, both involve bending at the knees. Based on the wording of Dr. Vore's opinion, which states Lynch can "not at all squat at the knees" that appears to be the reason for his restriction. (Tr. 373.)

regulations do not permit the ALJ to ignore it entirely. *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 546 (6th Cir. 2004) ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.") *See, also, Mazaleski v. Treusdell*, 562 F.2d 701, 719 n.41 ("[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway."). As discussed *supra,* some of the restrictions in the Physical Capabilities Questionnaire are more restrictive than those in the ALJ's determination of residual functional capacity, so the Court cannot dismiss the failure to address that opinion as a "harmless error."[9]

The Court also cannot impute the good reason given for discounting the less-restrictive opinion in Dr. Vore's treatment notes - the lack of a specific function-by-function assessment - to the Physical Capabilities Questionnaire because the latter is more detailed and specific in assessing specific functioning. Since the ALJ failed to articulate a good reason for discounting this opinion, the Court cannot look to other evidence in the record to justify the ALJ's omission. *See, e.g., Rogers*, 486 F.3d at 243 (failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.").

---

[9] In *Wilson v. Commissioner of Social Security*, 378 F.3d 541 (6th Cir. 2004)*,* the Sixth Circuit distinguished *Heston v. Commissioner of Social Security*, 245 F.3d 528 (6th Cir. 2001), explaining that its finding of harmless error in that case was based on the fact that "wittingly or not, the ALJ attributed to the claimant limitations consistent with those identified by the treating physician." *Wilson,* 378 F.3d at 547 48.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ failed to properly evaluate Dr. Vore's opinions, set forth in the Physical Capabilities Questionnaire, that Lynch would require a sit/stand/walk option at regular intervals and have additional restriction in pushing, pulling, driving, and squatting. This matter must be remanded to afford the ALJ the opportunity to sufficiently evaluate and explain the weight ascribed to the above limitations assessed by Dr. Vore.

### 2.     The Opinions of the State Agency Reviewing Psychologists

Lynch next argues that the ALJ erred in failing to address the mental limitations determined by the state agency reviewers, which he gave "great weight" in his opinion. (Doc. No. 12 at 16.) The state agency reviewing psychologists both opined that Lynch's affective disorders and anxiety-related disorders caused moderate limitations in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. (Tr. 73-75, 91-92.) They recommended that Lynch "work in a setting where pace can vary and there are no strict quotas," and "be in a setting where there are no more than occasional changes to routine and environment. (*Id.* at 74-75, 92.) On reconsideration, state agency reviewing psychologist Paul Tangeman also opined that Lynch was "capable of being around others on a frequent and superficial basis." (*Id.* at 92.)

The Commissioner acknowledges that the ALJ "did not weigh the mental limitations opined by the agency examiners," but asserts that this error was harmless because the ALJ adopted two of the recommended limitations and "implicitly rejected" the third. (Doc. No. 13 at 8.)

The ALJ's opinion states that he gave "great weight" to the opinions of the state agency reviewing psychologists. He writes "[t]he undersigned gives great weight to the assessments of the state agency consultants at the initial level and on reconsideration, which conclude that the claimant is able to perform light work, with moderate mental limitations." (Tr. 23.) He goes on to explain that "[t]he residual functional capacity further accounts for the claimant's mental health symptoms with limitations of no strict production requirements and the work environment should be static with only occasional changes in routine." (*Id.*)

The ALJ assigned "great weight" to weigh the mental limitations opined by the agency examiners, addressed two of those limitations in his opinion, and adopted them. However, he did not acknowledge the third recommendation, regarding Lynch's social interaction capacities, nor did he explain his decision to disregard it. (*Id.* at 92.) This requires explanation, because he did not qualify his determination that these opinions deserved "great weight." Accordingly, on remand, the ALJ should correct this error and explain the reasoning behind his treatment of state agency reviewing psychologist Paul Tangeman's opinion regarding Lynch's social interaction capacities.

**3.     The Opinion of Paul Agee**

Lynch also objects to the ALJ's treatment of the opinion of his chiropractor, Paul Agee. (Doc. No. 12 at 17.) He acknowledges that chiropractors are not "acceptable medical sources" under the Social Security regulations, but argues that as a "treating source," Dr. Agee's opinions regarding

the severity and functional effects of Lynch's impairments should have been given more than "little weight." (*Id.*)

The Commissioner notes that the ALJ did not base his evaluation of Dr. Agee's opinion solely on his status as an "other source." (Doc. No. 13 at 9.) The ALJ gave other good reasons for giving Dr. Agee's opinions "little weight." (*Id.*) He explained that Dr. Agee "did not provide an adequate explanation for his opinions," and that his conclusions were inconsistent with objective medical evidence. (Tr. 23.)

It is well-established a chiropractor is not an acceptable medical source under the Commissioner's regulations. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 530 (6th Cir. 1997). Rather, a chiropractor is an "other source," which is not subject to the "good reasons" requirement of the treating physician rule. *See* 20 CFR §§ 416.902(a)(1)-(8), 416.927(a)(1), 416.927(f). *See also Flores v. Berryhill*, No. 1:17cv0406, 2017 WL 6882551 at *16 (N.D. Ohio Dec. 15, 2017); *Jones v. Colvin,* 2014 WL 4594812 at *12 (N.D. Ohio Sept. 12, 2014); *Salah v. Comm'r of Soc. Sec.*, No. 1:12 CV 2104, 2013 WL 3421835 at *10 (N.D. Ohio July 8, 2013). Nonetheless, Social Security Ruling 06 03p[10] notes that information from "other sources" such as chiropractors "are important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06 03p, 2006 WL 2329939 at *2 3 (Aug. 9, 2006). *See also* 20 CFR § 416.927©. Interpreting this regulation, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable

---

[10] As noted *supra,* SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. *See* "Rescission of SSRs 96-2p, 96-5p, and 06-3p," 2017 WL 3928298 at *2 (SSA March 27, 2017). Here, Lynch filed his applications in November 2015, prior to the rescission of SSR 06-03p.

factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). *See also McKitrick v. Comm'r of Soc. Sec.*, No. 5:10 CV 2623, 2011 WL 6939330 at *12 13 (N.D. Ohio Dec. 30, 2011); *Kerlin v. Astrue*, No. 3:09cv00173, 2010 WL 3937423 at *7 (S.D. Ohio March 25, 2010). *See also* 20 CFR § 416.927(c), (f).

Here, the Court finds the ALJ's analysis of Dr. Agee's opinion satisfies the regulatory requirements for considerations of opinions from "other sources." The ALJ expressly acknowledged the opinion of Dr. Agee that Evans was limited to lifting and carry [sic] 10 pounds occasionally and has marked limitation in carrying out instructions," but rejected it on the grounds it "did not provide an adequate explanation for his opinions," and that his conclusions were inconsistent with objective medical evidence. (Tr. 23.) These are two of the three factors that the Sixth Circuit specifically identified as important in such an analysis. The Court finds the ALJ did not err in discounting Dr. Agee's opinion on this basis.

**B.      Other Assignments of Error**

Finally, as the matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Lynch's remaining assignments of error.[11]

## VII.   CONCLUSION

---

[11] Lynch's other assignments of error relate to the ALJ's determination regarding credibility and his analysis at Step Five of the sequential evaluation. A more through analysis of the medical opinion evidence may impact the ALJ's credibility analysis. The Step Five issue is premised on the Plaintiff's assertion that errors in handling the opinion evidence, discussed *supra*, led to an inaccurate determination of RFC. If, on remand, the ALJ makes a different finding of RFC, then a new Step Five analysis will also be required. (Doc. No. 12 at 1.)

For the foregoing reasons, the Commissioner's final decision is VACATED and the case

REMANDED for further consideration consistent with this decision.

**IT IS SO ORDERED.**

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 17, 2020